**In re Ricky L. SMITH, Debtor.**

**Ricky Lee SMITH, Plaintiff,**

**v.**

**Vicki Lynn SMITH, Defendant.**

**Bankruptcy No. NG 86–00372.
Adv. No. 86–0727.**

United States Bankruptcy Court,
W.D. Michigan.

Jan. 13, 1988.

Kozma Law Office, P.C., Kevin J. Kozma, White Cloud, Mich., for plaintiff.

Potuznik, Spaniola, Wilson, Anderson, & Nolan, P.C., Denis V. Potuznik, Muskegon, Mich., for defendant.

MEMORANDUM ON THE FINALITY AND DISCHARGEABILITY OF PROPOSED MARITAL PROPERTY SETTLEMENTS IN BANKRUPTCY

DAVID E. NIMS, Jr., Bankruptcy Judge.

Ricky Lee Smith ("Ricky"), the debtor in this voluntary Chapter 7 case, filed a com-

plaint for relief against his former wife, Vicki Lynn Smith ("Vicki") under Bankruptcy Rule 4007(a)–(b) seeking a declaration of dischargeability under 11 U.S.C. § 524 and sanctions for violations of that section's injunction. Ricky requests a finding that Vicki is in contempt of this court and an injunction enjoining her attorney, Denis L. Potuznik, and any agent, employee, or member of his law firm from taking any action within Michigan's 27th Judicial Circuit relative to the case of *Smith v. Smith*, No. 85–8517–DO. Ricky also requests that this court enjoin the 27th Judicial Circuit Court from entertaining any motion or proceedings that could conceivably result in a modification of a judgment of divorce entered May 6, 1986, in the divorce case.

The primary issue for determination in the present case is whether financial obligations incurred through a property settlement reached in a divorce proceeding and placed on the state court record prior to filing bankruptcy are dischargeable, even though the judgment of divorce is not entered until after the filing of the bankruptcy petition.

## FACTS

The parties have submitted this proceeding on an agreed statement of facts. The court must limit itself to this statement, except where it can amplify the statement from undisputed documents submitted with the parties' briefs, proofs of claim, and the petition, statements, and schedules filed in this court.

Together Ricky and Vicki, husband and wife (collectively, the "Smiths"), operated Rick's Family Restaurant (the "Restaurant") since its opening in October 1983. In order to finance their business, the Smiths borrowed some money from Vicki's parents, Charles and Nancy Krueger (collectively, the "Kruegers") in February of 1984. The promissory note, made payable to the Kruegers for $17,500 without interest, was signed as follows:

RICKS FAMILY RESTAURANT

BY:  /s/ Rick Smith        2–21–84
     /s/ Vicki Smith       2–21–84

its: OWNERS (JOINT)

(emphasis in original).

Almost a year later, on February 4, 1985, Vicki filed an action for divorce in the Newaygo County Michigan Circuit Court. A pretrial conference attended by the Smiths and their attorneys was held on July 2, 1985. At this hearing, the parties reached a property settlement agreement (the "Settlement") which was placed on the record in open court.

Among other provisions,[1] the Settlement addressed the Smiths' respective rights and responsibilities relative to the Restaurant and the repayment of the loan from the Kruegers. Ricky was to assume $12,500 of the $17,500 debt to the Kruegers, while Vicki assumed $5,000 of the indebtedness.[2] In exchange for Vicki's quitclaim deed of her interest in the Restaurant to Ricky, he would assume all debts of the business.[3] Vicki was also given a lien upon the Restaurant as security to cover her $5,000 debt in the event of a sale of the business.[4] To

---

1. Other provisions of the Settlement not discussed elsewhere in this paragraph include the following: first, Vicki was to receive a television and, their 1970 Buick while Ricky would receive all other vehicles; second, Ricky was to pay a certain medical bill; and third, the parties were to pay individual debts incurred in their respective names.

2. The Smiths were to execute new promissory notes to the Kruegers to be repaid with $200 monthly payments. The Kruegers were also given a lien on the Restaurant subject to prior existing liens.

3. The transfer was subject to Ricky's assumption of the following debts: a $40,000 mortgage to First State Bank of White Cloud; unsecured notes to the Bank for $4000 and $4500; and all vendors' accounts, utilities, taxes, and any other indebtedness associated with the Restaurant. In addition, Ricky was to place all utility and other business accounts of the Restaurant into his name.

4. Vicki's lien was to be subordinated to any indebtedness incurred by Ricky for necessary business purposes in operating the Restaurant.

this date, however, Vicki has never quit-claimed her interest in the Restaurant.

Vicki's attorney subsequently prepared a proposed judgment of divorce (the "Judgment"). Vicki signed the Judgment on October 15, 1985, some three months after the pretrial. Ricky and his counsel followed with signatures on December 27, 1985. Ricky's attorney apparently delayed returning the document to Vicki's attorney until February 23, 1986. Although Vicki's attorney never executed the Judgment, he nonetheless filed a motion in the circuit court the very next day for entry of the Judgment. The circuit court judge eventually signed the Judgment on May 6, 1986,[5] over the objection of both Vicki and her newly-acquired counsel. Paragraph VIII, the last paragraph of the Judgment, provides:

> It is Further Ordered and Adjudged that this Judgment of Divorce shall become final and effective upon the date of filing same with the Newaygo County Clerk.

The Newaygo county clerk date-stamped the Judgment as follows: "Received & Filed May 6, 1986."

Meanwhile, Ricky filed his voluntary petition for relief under Chapter 7 of Title 11 of the United States Code in this court on February 11, 1986. He scheduled the Kruegers as unsecured creditors for $12,500 and Vicki as a contingent claim, contingent on the Restaurant being sold, up to the sum of $5,000. He scheduled the assets of the Restaurant as his sole assets, and made the following notation at the bottom of "Schedule B-1 Real Property":

> * Note: Divorce proofs relative to debtor and Vicki Smith were taken in 7/85;

judgment has been prepared for months—unknown as to why attorneys have not entered same. Judgment indicates that Vicki Smith shall quit claim [sic] her interest in above stated real estate parcels, and that debtor shall assume all restaurant related debt other than $5,000.00 of the total $17,500.00 debt owed to Charles and Nancy Krueger.

Although Vicki received proper notice of the first meeting of creditors, she did not appear. Nor did she file a proof of claim or an objection to discharge.

The trustee of this estate apparently assumed that the Settlement was final, and liquidated the assets on this basis. He filed a petition for authority to sell the Restaurant to the First State Bank of White Cloud (the "Bank") for $55,000 or to any higher bidder. On June 27, 1986, notice of the hearing on this petition was served by mail on all creditors, including Vicki and the Kruegers, and 245 buyers who are on this court's "buyers list." No adverse entity appeared at the hearing held July 21, 1986, and an order confirming the sale was entered on that date. The Bank paid to the trustee the $55,000 less the amount due on the mortgage of $41,358.48. On September 15, 1986, an order to show cause was issued to all creditors (again including Vicki and the Kruegers) as to why the funds received on the sale should not be disbursed.[6] No one appeared at the hearing on the proposed disbursements so an order approving them was signed.

Expenses of administration were allowed as filed. Again all creditors were notified and no objections were voiced. An insuffi-

---

5. The heading of the Judgment indicates that the order was signed at a session of court held on May 6, *1985*. This is an obvious typographical error most likely due to the lengthy delay involved in obtaining approval of the order.

6. The trustee proposed that the sale proceeds be disbursed as follows:

| | |
|---|---|
| State of Michigan (tax lien) | $1,614.15 |
| City of White Cloud (personal property taxes) | 1,140.63 |
| County of Newaygo (real estate taxes) | 5,328.64 |
| City of White Cloud (real estate taxes) | 452.06 |
| White Cloud Sherman Utilities (lien) | 1,016.96 |
| State of Michigan (secured tax claim) | 1,614.50 |
| Consumers Power (administrative claim) | 260.96 |

cient amount was left to pay the expenses of administration in full. The Restaurant was a business that had no value—its liabilities far exceeded its assets.[7] The bankruptcy case was closed May 26, 1987.

Ricky received his discharge at a hearing held on July 21, 1986. Only three days later, on July 24, 1986, Vicki's attorney filed a motion in the state court to have the Settlement set aside. As the basis for her motion, Vicki alleged a drastic change in circumstances between the Smiths and the failure of her former attorney to obtain proper security for the payment of Ricky's debts. She argued that Ricky never intended to pay the obligations agreed to in the Settlement but planned instead to file bankruptcy and obtain a discharge of the Settlement obligations. At a hearing held on September 16, 1986, Ricky's bankruptcy attorney requested that the court dismiss Vicki's motion. Aware of the Bankruptcy Code's injunctions, but citing apparent

fraud, the circuit judge ordered the Settlement set aside for sixty days to allow Vicki's counsel to conduct further investigation and file appropriate pleadings.[8] The divorce decree itself remained final.

Ricky's attorney subsequently filed a motion for reconsideration or modification of that decision. At a hearing on December 2, 1986, the judge denied Ricky's request and awarded costs of $250 to Vicki. The state court has taken no further action in the Smiths' divorce proceeding to this date.

Ricky's attorney also filed the present adversary proceeding for injunctive relief in this court on September 25, 1986. At the December 22, 1986, pretrial conference, the court verbally ruled that it would take the issue of contempt and related damages under advisement. Both parties agreed that in the meantime neither would take any further action in the state court proceeding, and none in fact has been taken.

---

7. The claims filed by creditors indicate that unpaid business liabilities consisted of:

| Claim Number | Creditor | Amount | Consideration |
| --- | --- | --- | --- |
| 2 | White Cloud/Sherman Twp. Utilities | $ 331.01 | Connection of Restaurant to sewer system |
| 4 | Kruegers | 17,500.00 | Loan |
| 7 | State of Michigan | 1,614.15 | Sales & withholding tax |
| 8 | State of Michigan | 9,759.19 | Sales, withholding, & single business tax |
| 12 | Bank | 6,101.29 | Loan |
| 13 | Bank | 391.52 | Loan |
| 14 | Bank | 2,841.09 | Loan |
| 15 | Bank | 2,267.28 | Loan |
| 16 | U.S.—I.R.S. | 52,680.83 | Withholding tax |
| | Total | $93,486.36 | |

8. The transcript of the hearing on September 16, 1986, reads, in pertinent part, as follows:

THE COURT: Well, look. Here's what the situation appears to the Court. It just doesn't seem to be fair that a guy could, you know, make a deal with his wife's relative to the division of property and the obligation of debts and before the judgment is signed run bankrupt which essentially leaves her with all the debts. It appears to me to be somewhat fraudulent on its face, and for that reason I am going to set aside the property settlement provisions of the judgment, the parties are still divorced, for a period of 60 days to allow you to investigate and file whatever papers you deem appropriate. Obviously the bankruptcy court is involved. The Court doesn't know to what extent that has a bearing on its

jurisdiction even to enter this particular order but I guess that's the problem of the two of you to resolve.

. . . .

THE COURT: I wouldn't think that I am violating the restraining order from the bankruptcy court. I'm not collecting any monies or anything of that nature. I'm just questioning—putting into question the fairness of whether a fraud existed on one party or another relative to the motivation as to this negotiation of the property division.

. . . .

THE COURT: Well, I'm just thinking there is enough here that involved an inquiry because like I said—On the face of it you can't negotiate in good faith with another person and and then run bankruptcy before entry of

## DISCUSSION

### I. *Dischargeability of Partnership Debts under a Marital Property Settlement*

At the time Vicki's divorce complaint was filed, the Restaurant was a partnership consisting of Ricky and Vicki as copartners. A partnership consisting solely of a husband and wife is valid. Mich.Comp. Laws § 449.6 (1967) (Mich.Stat.Ann. § 20.6 (Callaghan 1981)). There being no proofs to the contrary, this court assumes that the partners made equal contributions and thus have an equal interest in the assets. Mich. Comp.Laws § 449.18 (1967) (Mich.Stat.Ann. § 20.18 (Callaghan 1981)). Also, Ricky and Vicki were jointly liable for the debts of the Restaurant. Mich.Comp.Laws § 449.15 (1967) (Mich.Stat.Ann. § 20.15 (Callaghan 1981)). This included the note for $17,500 made payable to the Kruegers. Ricky was granted a discharge which, with the exceptions provided in 11 U.S.C. § 523, discharged him of all debts that arose before the date of the order for relief. 11 U.S.C. § 727(b). Thus, under ordinary circumstances Ricky's indebtedness to the Kruegers and all other partnership debts would be discharged.

However, Vicki claims that Ricky is still liable for all of the partnership debts because the Settlement constitutes an independent source of liability. Her arguments may be summarized as follows: first, the Settlement was a postpetition debt and therefore not dischargeable as a claim under 11 U.S.C. § 727(a); second, the Settlement resulted in the obtaining of property by fraud and therefore is not a dischargeable debt under 11 U.S.C. § 523(a)(2); and third, the Settlement created an alimony obligation and therefore is not a dischargeable debt under 11 U.S.C. § 523(a)(5).

### A. *Jurisdiction*

Divorce and bankruptcy are equitable proceedings. Divorce and financial difficulties often occur simultaneously. It behooves the circuit judges and bankruptcy judges to work together so that the greatest good will be done. The state judge must weigh the equities between the spouses before the court and treat them with fairness and compassion. Among his duties in this regard is to divide the property accumulated by the marital entity between the parties before him by weighing many factors.

The bankruptcy judge's function in a Chapter 7 case is two-fold. On the one hand he must oversee the marshalling and liquidation of the assets of the debtor and distribution of the estate as set forth by the bankruptcy code. Equally important is the granting to the honest debtor a discharge of his dischargeable debts and insuring the fresh start provided by statute by enforcing the injunction set forth in 11 U.S.C. § 524(a)(2) and (3). A reasonable courtesy between divorce courts and bankruptcy courts should result in justice and equity being afforded to all parties involved.

In the trial before this court in *Chrystler v. Heslar (In re Heslar)*, 16 B.R. 329 (Bankr.W.D.Mich.1981), a trustee made a claim for the husband-debtor's share of proceeds resulting from the trustee's sale of entireties property during the debtor's pending divorce proceeding. The determination of the extent of the debtor's interest depended upon the divorce court's division of marital property. In my opinion I recognized the position of the bankruptcy courts as stated in *Kalb v. Feuerstein*, 308 U.S. 433, 60 S.Ct. 343, 84 L.Ed. 370 (1940):

> The Constitution grants Congress exclusive power to regulate bankruptcy and under this power Congress can limit the jurisdiction which courts, State or Federal, can exercise over the person and property of a debtor who duly invokes the bankruptcy law. If Congress has vested in the bankruptcy courts exclusive jurisdiction over farmer-debtors and their property, and has by its Act withdrawn from all other courts all power under any circumstances to maintain and enforce foreclosure proceedings against them, its Act is the supreme law of the land which

the judgment. I'm not—I wouldn't allow any costs at this point.

all courts—State and Federal—must observe. 308 U.S. at 439, 60 S.Ct. at 346. 16 B.R. at 331. In abstaining and allowing the state courts to proceed, I stated:

State law provides ample jurisdiction to Circuit Courts for the disposition of property of the parties to a divorce action. These courts handle divorces on a daily basis. The expertise of Circuit Judges in the family law field extends not only to legal problems but also to the disciplines of psychology and sociology. Specially trained personnel and the organization of the Court functions are geared to the protection of the rights of not only the parties themselves but also those of the children of the marriage and other family members.

In no other field does abstention better serve the interests of the parties and other interested persons than in that of domestic relations law.

*Id.* at 333. *See also Wasserman v. Washington (In re Washington),* 623 F.2d 1169 (6th Cir.1980), *cert. denied* 449 U.S. 1101, 101 S.Ct. 896, 66 L.Ed.2d 826 (1981) (under the 1898 Bankruptcy Act, principles of comity require that, as between state and federal courts, the first court to obtain jurisdiction would retain it);[9] *Johnson v. Fisher (In re Fisher),* 67 B.R. 666 (Bankr.D. Colo.1986) (wife granted relief from stay to allow divorce court to determine the value of her share of the marital property in the husband's bankruptcy estate, uniquely a problem of interpretation and application of domestic relations law); *Johnson v. Johnson (In re Johnson),* 51 B.R. 439 (Bankr.E. D.Pa.1985) (leave granted the parties to proceed before the divorce court for equitable distribution to determine husband-debtor's interest in jointly owned marital property); *Schock v. Schock (In re Schock),* 37 B.R. 399 (Bankr.D.N.D.1984) (despite the automatic stay, state court could dissolve marriage between parties, although it could make no determination or

disposition of property of the bankruptcy estate).

In *Willard v. Willard (In re Willard),* 15 B.R. 898 (Bankr. 9th Cir.1981) a California Superior Court dissolution action was heard to determine the respective rights of a husband and wife. On July 8, 1980, an Intended Decision was filed with the superior court and sent to the parties. *Inter alia* this proposed decision awarded the residence to the wife and directed the husband to convey legal title to her. On September 17, 1980, the husband filed a voluntary Chapter 7 bankruptcy. On September 25, 1980, the superior court entered judgment in accordance with the Intended Decision. The bankruptcy appellate panel held that the judgment was not final until after the bankruptcy was filed and was therefore ineffectual. Although the divorce court's judgment was valid as between the parties, it was not effective against the bankruptcy estate. The judgment of the bankruptcy judge denying the turnover of the residence by the trustee was affirmed. *See also Pagitt v. Pagitt (In re Pagitt),* 3 B.R. 588 (Bankr.W.D.La.1980) (relief from stay to permit appeal of divorce was denied because issue of division of community property was of vital concern to bankruptcy court).

### B. *Characterization of the Settlement Obligations*

Usually, a property settlement does not become effective until the judgment is entered. In *Saunders v. Smith,* 86 Mich. App. 1, 272 N.W.2d 174 (1978) on March 30, 1976, a divorce proceeding was heard and the parties reached an agreement as to division of property. The entire property settlement was stated on the record. At the end of the *pro confesso* proofs, the judge stated, "Judgment is granted. Property disposed of as set forth on the record." *Id.,* at 2, 272 N.W.2d at 175. On

---

**9.** Its ruling might have been different under 28 U.S.C. § 1471(e), which provides as follows:

(e) The bankruptcy court in which a case under title 11 is commenced shall have exclusive jurisdiction of all the property, whereever [sic] located, of the debtor, as of the commencement of such case.

inquiry by counsel, the judge stated he had no objection to the judgment being given immediate effect. However, Phyllis Smith died April 28, 1976, before a written judgment of divorce had been entered. On the motion of the decedent's sister and special administratrix of Phyllis Smith's estate, a default judgment *nunc pro tunc* was entered June 17, 1976. On appeal, the decision of the trial judge was affirmed. Subsequently, in *Saunders v. Smith,* 405 Mich. 833, 289 N.W.2d 925 (1979), motions for leave to appeal and peremptory reversal were considered and, in lieu of leave to appeal, the judgments of the court of appeals and the circuit court were reversed. The Michigan Supreme Court ruled:

"We hold that where it is contemplated that a judge's oral statement, that a divorce is or will be granted, will be followed by the signing of a judgment, the divorce and property settlement do not become effective until the judgment is signed and cannot be made effective *nunc pro tunc* after one of the parties dies." *Tiedman v. Tiedman,* 400 Mich 571, 573 [255 N.W.2d 632] (1977).

*Id.,* at 834, 289 N.W.2d at 925.

But here we have a *unique* situation. At the pretrial conference held on July 2, 1985, the parties entered into an agreement which was placed on the record and apparently the judge asked that a formal judgment be submitted. The Judgment was not signed and entered until May 6, 1986, more than ten months later. Perhaps a ten-month wait for a divorce will not create a hardship—it might even lead to a reconciliation. Commercial matters, however, cannot be postponed. Someone had to take over the Restaurant and operate it. Believing there was an agreement, Ricky did take control and no one objected. When, in February of 1986, he filed his petition for relief he assumed he was the owner of the Restaurant. Although Vicki and her parents received notices from this court of the,

sale of the business by the trustee, they made no objection.[10]

■ No reason exists to believe that the parties were not acting in good faith when the Settlement was reached in July of 1985. Regardless of the true worth of the Restaurant, I find that both Ricky and Vicki subjectively believed the Settlement was fair. However, I do not believe Ricky is still bound by the obligations imposed by the Settlement. In May of 1986 the business was bankrupt, with debts far exceeding the value of assets. If the Settlement became effective at this time, Ricky would be receiving a worthless business in return for surrendering his rights to a discharge of all of the partnership debts. Since the business was worthless, this agreement was without consideration and therefore unenforceable.

■ Furthermore, even if the Settlement is considered valid, Ricky has been discharged from its terms. Vicki disagrees, contending that the Settlement does not create a debt which can be discharged within the meaning of 11 U.S.C. § 727(a). This section provides that "[t]he court shall grant the debtor a discharge," with certain exceptions. *Id.* No claim is made that any of the exceptions set forth in § 727 apply and, in fact, no timely objection was made to Ricky's discharge. Under § 727(b) the effect of that discharge was to release the debtor "from all debts that arose before the date of the order for relief under this chapter." .

The bankruptcy code defines "debt" as meaning "liability on a claim." 11 U.S.C. § 101(11). "Claim", in turn, is defined at § 101(4) as meaning:

(A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or

(B) right to an equitable remedy for breach of performance if such breach

---

**10.** The trustee neglected to ascertain the legal business relationship of the parties. However, the assets of the estate have already been dis-

tributed without objection and this issue is not property before the court.

gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

As was recognized when the Code was enacted, this definition was a significant departure from the terms of the former Bankruptcy Act in that it is much broader than the Act definition of the "claim". S.Rep. No. 989, 95th Cong., 2d Sess. 21–22, *reprinted in* 1978 U.S.Code Cong.Admin. News 5787, 5807–8. The extreme breadth of this definition was intended by Congress so that "all legal obligations of the debtor, no matter how remote or contingent, will be able to be dealt with in the bankruptcy case. It permits the broadest possible relief in the bankruptcy court." *Id.*

The obligation Ricky incurred directly to the Kruegers would certainly fit into this definition as a right to payment. The obligations Ricky incurred to Vicki and the Kruegers under the Settlement would also fall under this definition. Granted, the Settlement may not have had the force of a judgment until signed by the state court judge. Nonetheless, a right to payment is a claim dischargeable in bankruptcy "whether or not such right is reduced to judgment." 11 U.S.C. § 101(4)(A). Equally, the right to a payment might have been contingent upon some other occurrence (e.g., the judge's signature, a condition contained in the Settlement, Vicki's execution of the quitclaim deed, or any other act which did not take place until after Ricky filed his petition, or which may not yet have taken place). Yet such contingent rights are also discharged in bankruptcy. An objection based on the maturity or immaturity of the obligation would also succumb to the same analysis. Therefore, even if the Settlement was not invalid for lack of consideration when it was made, all the obligations which Ricky owed under the Settlement were discharged in his bankruptcy.

I realize how vexing all this must be to Vicki. However, this result is mandated by the larger purposes of the Bankruptcy Code. As was stated in *Local Loan Co. v. Hunt,* 292 U.S. 234, 54 S.Ct. 695, 78 L.Ed. 1230 (1934):

> One of the primary purposes of the Bankruptcy Act is to "relieve the honest debtor from the weight of oppressive indebtedness, and permit him to start afresh free from the obligations and responsibilities consequent upon business misfortunes." *Williams v. U.S. Fidelity & Guaranty Co.,* 236 U.S. 549, 554–555, 35 S.Ct. 289, 290, 59 L.Ed. 713. This purpose of the act has been again and again emphasized by the courts as being of public as well as private interest, in that it gives to the honest but unfortunate debtor who surrenders for distribution the property which he owns at the time of bankruptcy, a new opportunity in life and a clear field for future effort, unhampered by the pressure and discouragement of pre-existing debt. The various provisions of the Bankruptcy Act were adopted in the light of that view and are to be construed when reasonably possible in harmony with it so as to effectuate the general purpose and policy of the act. Local rules subversive of that result cannot be accepted as controlling the action of a federal court.

*Id.,* at 244–245 54 S.Ct. at 699 (citations omitted) (emphasis in original). Senator Daniel Webster in support of the Bankruptcy Act of 1841, the first bankruptcy legislation to allow the filing of a voluntary bankruptcy case, said:

> I verily believe that the power of perpetuating debts against debtors, for no substantial good of the creditor himself, and the power of imprisonment for debt, at least as existed in this country ten years ago, have imposed more restraint on personal liberty than the law of debtor and creditor imposes in any other Christian and commercial country.

*The Writings and Speeches of Daniel Webster,* Vol. IX (1903). Consequently, I find that the obligations of Ricky under the Judgment existed as of the date of the

filing of his bankruptcy and are dischargeable debts.

### C. *Fraud*

■ Vicki asserts that Ricky obtained property by fraudulently leading her to believe that he was negotiating in good faith. She alleges that he had no intention of paying the partnership debts but planned to obtain a discharge of them through the bankruptcy laws. The circuit judge indicated that he agreed and, as a result, he revoked the Settlement.[11] With the information available to him, I can understand the circuit judge's concern.

However, looking at the facts in the light of the bankruptcy code, I find that Ricky was not guilty of fraud, false pretenses, or false representation. Furthermore, Vicki never introduced any substantial proofs of fraud. (Of course the time to file a complaint for a denial of dischargeability because of fraud expired long ago. 11 U.S.C. § 524(c); Bankr.Rule 4007(c).) It was not until months after the Settlement was agreed upon that he filed his petition in Chapter 7 as he had a right to do. If he were held to the Settlement he would be giving up his fresh start for no consideration. I therefore hold that Vicki's allegations do not meet the requirement for nondischargeability under 11 U.S.C. § 523(a)(2)(A). *Cf. e.g., Caspers v. Van Horne (In re Van Horne)*, 823 F.2d 1285 (8th Cir.1987) (debtor's fraudulently obtained renewal of loan from mother-in-law by intentional nondisclosure of deteriorating relationship with wife, and mother-in-law's waiver of foreclosure right in reliance thereon, rendered debtor's obligation on renewal note nondischargeable).

### D. *Alimony*

■ Vicki claims that the Settlement is in fact a grant of alimony and support. A debt to a spouse or former spouse for alimony, maintenance, or support in connection with a divorce decree is not dis-

chargeable, with certain exceptions not material in this case. 11 U.S.C. § 523(a)(5). While the facts in *Long v. Calhoun (In re Calhoun)*, 715 F.2d 1103 (6th Cir.1983), are not entirely similar to our case, the decision nonetheless gives some guidance as to what constitutes an alimony obligation. In that case the bankruptcy court held that the assumption of five loan obligations was nondischargeable. The court of appeals found that the bankruptcy court erred: first, in holding that the separation agreement should control unless it would work a manifest injustice; and second, in not considering each loan obligation separately. Judge Kennedy held that "payments in the nature of support need not be made directly to the spouse or dependent to be nondischargeable." *Id.*, at 1107.

This court can find none of the facts present in this case that other courts have looked to in determining whether an agreement to hold a spouse harmless is alimony. No evidence that the parties had children can be found and no children were mentioned in the Judgment. Neither was there an indication that Vicki was unemployed and possessed no job-related skills, as was true in *Shaver v. Shaver*, 736 F.2d 1314 (9th Cir.1984) where the wife had custody of three children. In *In re Singer*, 787 F.2d 1033 (6th Cir.1986) where the wife was 60 years old, had not worked outside the home during marriage, and the husband had paid her $200 per week after separation, the court held periodic payments to be nondischargeable. The court stated:

> The three basic scenarios arising from the statute are as follows: 1, if payment, i.e. Settlement Agreement, is for alimony, maintenance, or support, the debt is non-dischargeable; 2, conversely, if the payment, or Settlement Agreement is strictly a property settlement, the debt is dischargeable; 3, where there is a property settlement in connection with alimony, maintenance, or support, the debt is non-dischargeable.

---

**11.** *But see* 11 U.S.C. § 707(b).

*Id.,* at 1034. I find that the Settlement in this case is not alimony, but strictly a property settlement under 11 U.S.C. 523(a)(5), and therefore the debts are dischargeable.

## II. *Contempt*

■ Ricky requests a finding that Vicki violated the automatic stay and is in contempt of this court and that damages be awarded to him pursuant to 11 U.S.C. § 362(a). Perhaps Vicki is in technical contempt of court. However, the court finds that the action of her and her attorney was not a deliberate violation of the automatic stay.

This has not been an easy proceeding to decide—this court has held this matter under advisement longer than any other case in recent years because of the complicated situation presented. All of the judges and law clerks of this court have had an input into the final decision. If these supposed experts in the field of bankruptcy law had so much difficulty with this, how can a judge expect a layman to be aware of the many facets to be considered? The court finds that Vicki is not guilty of contempt of court.

## III. *Injunction*

Ricky also seeks an injunction to prevent further action against him on the partnership debts and on any property settlement in the divorce court which violates his rights under his discharge. No injunction is granted because it is not necessary—two injunctions are no better than one. A more than adequate injunction exists under 11 U.S.C. § 524(a)(2)–(3).